IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

```
LOUIE ALEXANDER,              )
                              )
      Plaintiff,              )
                              )      CIVIL ACTION NO.
      v.                      )       3:09cv605-MHT
                              )          (WO)
EVENING SHADE INC., d/b/a     )
PENNY PROFFIT CLEANERS, and   )
RICK HADDOCK,                 )
                              )
      Defendants.             )
```

OPINION AND ORDER

Plaintiff Louie Alexander, an African-American male,
brings claims for race discrimination and retaliation,
pursuant to Title VII (Title VII of the Civil Rights Act
of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e to 2000e),
and § 1981 (Civil Rights Act of 1866, as amended, 42
U.S.C. § 1981), against defendants Evening Shade Inc.,
doing business as "Penny Proffit Cleaners," and Rick
Haddock.  Jurisdiction is proper under 28 U.S.C. § 1331
(federal question), § 1343 (civil rights), and § 42
U.S.C. § 2000e-5(f)(3) (Title VII).  Penny Profit

(incorrectly spelled by Alexander as Penny Proffit) and Haddock now move for summary judgment on these claims. For the reasons that follow, the motion will be denied in part and granted in part.


I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Under Rule 56, the court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Penny Profit is a dry cleaning business with various branches throughout the State of Alabama.  In September 2007, it hired Alexander in its Auburn branch to wash, separate, sort, and bag clothes and transport them to and from its Opelika branch.  After completing his initial training, Alexander began working 30 to 35 hours a week.

Alexander asserts that, soon after Haddock purchased the business in March 2008, Haddock dramatically cut Alexander's hours: Alexander's schedule was reduced to 20 to 25 hours a week in the months following Haddock's take-over, and, in the next year, he was assigned to work fewer than 15 hours a week.  He alleges that his hours were reduced further when a white Penny Profit employee, as well as white employees from Haddock's other businesses, began assuming his job tasks.[1]

_____

1. In addition to Penny Profit, Haddock owns Vintage Comfort, Inc., Haddock Corp. (d/b/a Auburn Automotive), and Vision Collision Center, Inc.  Auburn Automotive and Vision Collision Center, Inc. are auto-repair businesses, while Vintage Comfort owns the real estate upon which
(continued...)

3

Alexander also alleges that, under Haddock, working hours for black employees were cut drastically, while the hours for white employees remained unchanged, and that whites were assigned to more favorable posts within the store. Alexander states that only white employees were scheduled to work at the front-counter cash register, a position with a fixed schedule, while black employees were forced to work "in the back" of the dry cleaning plant, where the hours are dependent on the business's work-load. Pl.'s Br. at 4 (Doc. No. 37). He contends that, consequentially, black employees consistently received fewer hours than white employees. He also avers that the racial division was apparent among the store's supervisors, and states that white supervisor Beth Taylor "was hired to work in the back but is now working in the front," while black supervisor Sheika Dumas is "forced to work in back." Id.

---

1. (...continued)
Haddock's other businesses operate.

4

After Alexander complained to Haddock about racial discrimination in the workplace, Haddock issued him a reprimand, charging him with incorrectly bagging clothes. When Alexander continued to protest his treatment, Haddock purportedly "continued to write [him] up." Pl's Br. at 7. On July 8, 2008, Alexander filed a charge of race discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that Haddock "reduced the hours for African American employees, which reduced their wages," while "white employees did not suffer a similar hour reduction or wage reduction." EEOC Compl. (Doc. No. 37-2). After the EEOC notified Penny Profit of its investigation, Haddock increased Alexander's hours to approximately 15 a week; however, his hours were reduced to less than 10 a week after the EEOC dismissed the charge. Alexander states that, after he complained to the EEOC, "he was harassed weekly and falsely accused of wrongdoing by Haddock." Pl's Br. at 23.

5

Alexander, who continues to work at the dry cleaning business, filed this lawsuit on June 29, 2009.


### III.   JURISDICTION

Penny Profit and Haddock contest the court's jurisdiction over Alexander's Title VII claims, asserting that Penny Profit does not fall within the statutory definition of "employer," and thus is not subject to suit under Title VII.   Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."   42 U.S.C. § 2000e(b).   Whether Penny Profit constitutes an employer under the statute is a "threshold jurisdictional issue" for the court to decide.   Scarfo v. Ginsberg, 175 F.3d 957, 961 (11th Cir. 1999).

The record here reflects that the Title VII claims are properly before this court.   The time sheets submitted by Alexander show that, in 2009, Penny Profit

6

employed at least 14 workers for 20 weeks or more during the calendar year, and Alexander testified that at least three employees who were not listed in the haphazard collection of time cards worked full-time at the business.  This evidence is sufficient to support a finding of jurisdiction.  See Virgo v. Riviera Beach Associates, Ltd., 30 F.3d 1350, 1361 (11th Cir. 1994) (finding Title VII's jurisdictional requirement was satisfied where "[n]ine employees are specifically identified in the record, and many other positions are described including the restaurant staff, maintenance staff, housekeeper, and lounge staff.").

## IV.   DISCUSSION

### A. Disparate Treatment

Alexander claims that he suffered race discrimination in the terms and conditions of his employment, in violation of Title VII and § 1981.  These claims are governed by the familiar burden-shifting scheme set forth

under  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (Title VII and § 1981 "have the same requirements of proof and use the same analytical framework.").  Alexander may survive summary judgment by establishing a prima-facie case that he was (1) a qualified member of a protected class; (2) subject to an adverse-employment action; and (3) treated less favorably than a similarly situated individual outside the protected class.  See Wilson v. B/E/ Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).  Once Alexander shows these elements, the burden shifts to Penny Profit and Haddock to articulate a legitimate and non-discriminatory reason for their actions.  Id.  Their evidence should "allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 257 (1981). If Penny Profit and Haddock can articulate one or more

8

non-discriminatory reasons, "then the presumption of discrimination is rebutted, and the burden of production shifts to [Alexander] to offer evidence that the alleged reason ... is pretext for illegal discrimination." Wilson, 376 F.3d at 1087.

Alexander has satisfied the first two prongs of his prima-facie case. He is clearly a member of a protected class, and there is little doubt that he suffered an adverse-employment action, as a reduction in hours results directly in a reduction in pay, which is actionable under Title VII and § 1981. See Minix v. Jeld-Wen, Inc., 2006 WL 2971654 at *3 (M.D. Ala. 2006) (Thompson, J.) ("Employment decisions that alter compensation are obviously tangible employment decisions, and thus 'a reduction in an employee's hours, which reduces the employee's take home pay, qualifies as a tangible employment decision.'") (citations omitted). Alexander's time sheets demonstrate that he maintained, on average, a 35-hour work week in the months before

Haddock purchased Penny Profit in March 2008; by late 2009, Alexander worked fewer than 15 hours a week.

Where Alexander runs into difficulty is establishing the third prong of his prima-facie case.  In order to establish circumstantial evidence of discrimination, a plaintiff may demonstrate he has been treated less favorably than a similarly situated individual outside the protected class.  However, because Alexander is the sole individual employed in his particular position and because he is the only one subject to the job's specific standards and responsibilities, he cannot rely upon a comparator to show that his hours were reduced as a result of his race.[2]  See Wilson v. Alabama Dept. of Human Resources, 2010 WL 1254319 at *4 (M.D. Ala. 2010) (Thompson, J.) ("In order to constitute 'similarly situated' employees, the individuals must have '(1) dealt

_____

    2. Haddock stated that Alexander is the only employee in charge of bagging clothes and delivering them to the Opelika branch, except on the days when Alexander "calls in sick" and Haddock assigns the tasks to another employee.  Haddock Dep. at 37 (Doc. No. 37-8).

10

with the same supervisor, (2) been subject to the same standards, and (3) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (citations omitted).

Nevertheless, the methods of establishing a prima-facie case "are flexible and depend to a large degree upon the employment situation." Wilson, 376 F.3d at 1087. See also Ralston v. Bell Aerospace Services, Inc., 2010 WL 2403084 at *5 (M.D. Ala. 2010) (Thompson, J.) ("[D]emonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination.") (citations omitted). Thus, the court examines whether Alexander has presented any other evidence of disparate treatment that would give rise to an inference of intentional discrimination. See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) ("If a plaintiff fails to show the existence of a similarly situated employee, summary

11

judgment is appropriate where no other evidence of discrimination is present.").

Alexander's primary evidence of race discrimination concerns the reduction in his working hours, and the working hours of all black employees, after Haddock purchased Penny Profit. He asserts that, while the hours of other black employees were reduced generally after Haddock's takeover, his hours in particular decreased significantly, because Haddock allowed white employees to assume many of his job responsibilities. Addressing his schedule change, Alexander testified that a white Penny Profit employee and three white men who worked for Haddock in his independent automotive businesses were put in charge of Alexander's regular tasks, including "the laundry, the sorting of the clothes, and the assembling." Alexander Dep. at 33-34 (Doc. No. 37-7). At times, his sole responsibility was "driving the clothes to Opelika." Id. at 34. Consequently, his working schedule decreased from 35 hours a week to less than 10 hours a week, over

the course of Haddock's ownership.  As for the other black employees, Alexander points to time sheets submitted before this court as evidence that Haddock "cut the hours of all the black employees," while the "white employee[s'] hours stayed the same."  Pl.'s Br. at 3.

Apart from his scheduling arguments, Alexander also alleges that his supervisor, Taylor, discriminated against him in the course of his employment--once when she reprimanded him for "taking too long" during his delivery to Opelika, and on another occasion when she "cursed him out" in front of other employees.  Alexander Dep. at 69.  Finally, Alexander contends that Haddock refused to assign him to work as a cashier at the front counter (which would have increased his weekly hours), despite the fact that Alexander was capable of performing the requisite duties.

Alexander's evidence of disparate treatment is based almost entirely on his own testimony; however, at this stage in the litigation, the court accepts the

13

allegations in the light most favorable to Alexander. Nevertheless, Alexander's factual assertions are not sufficient to establish a prima-facie case of disparate treatment. As to his principal allegation (that Haddock purposely reduced his hours in favor of white employees), it is evident from the company time cards that Alexander's hours decreased substantially in the year after Haddock assumed ownership of Penny Profit; but Alexander has failed to show any causal connection between the reduction in hours and his race, that is, there is nothing in the record to suggest that his hours were cut because he was black, nor is there evidence that other employees were given his tasks because they were white.[3]   There is also no evidence that white employees were hired for the purpose of appropriating Alexander's tasks, and Alexander himself admits that both white and

---

3. Alexander offers a notarized deposition by Penny Profit employee Renita Robinson, in which she attests that Haddock "cut down on [Alexander's] hours and give [sic] it to the white [sic]." Doc. No. 37-13.  Again, this deposition does not suggest that Haddock was motivated by racial animus in reducing Alexander's hours.

black employees began assuming his job responsibilities under Haddock, negating any contention that only white employees benefitted from Alexander's reduction in hours.[4]

Furthermore, Alexander fails to make an adequate showing that Haddock reduced the hours of only his black employees.  Alexander has 'dumped' a collection of time sheets upon this court, asserting that they demonstrate disparate impact.  However, after reviewing the time sheets, the court finds that this conclusion is not, in fact, an obvious one.  To the contrary, these company records appear to demonstrate that the hours of all employees, both black and white, decreased over the relevant time period.  Moreover, it is not the court's obligation to distill the evidence that Alexander has provided in support of his claim.  See Edwards v. Hyundai

---

4. Alexander states that, after complaining to Haddock about race discrimination, "Sheika, Vannie, and Beth" were tasked with sorting clothes, a job originally assigned to Alexander.  Pl.'s Br. at 7.  He also alleges that he was no longer allowed to do the laundry during his afternoon shifts, as "Sheika and Erica ... wash the clothes in the morning."  Id.  According to Alexander, both Sheika and Vannie are black females.

15

Motor Mfg. Alabama, LLC, 2009 WL 1257164 at *3 (M.D. Ala. 2009) (Thompson, J.) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions.") (citations omitted).  The court "is under no obligation to comb through [the evidence] to help a party meet its burden under the law," Bell Aerospace, Inc. V. U.S. Aero Services, Inc., 690 F. Supp. 2d 1267, 1274 (M.D. Ala. 2010) (Thompson, J.), and the time sheets alone do not substantiate a claim for disparate treatment.

As to his allegation regarding Taylor, while she may have treated Alexander with discourtesy, this treatment is insufficient to support a finding of intentional discrimination, when there is no other evidence of racial animus.  See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998) ("Title VII does not establish "a general civility code for the American workplace."). Finally, Alexander's bare assertion that he was discriminated against when Haddock refused to assign him

16

to the cash register proves very little; Alexander does not state that he was similarly situated to the white employees who were allowed to work the cash register, and the fact that both white and black employees have been, and continue to be, assigned to the position defeats Alexander's claim of race discrimination.   In short, Alexander cannot demonstrate that he was the victim of discrimination in the workplace, or that he received less favorable treatment than comparable white employees.

However, even presuming Alexander has presented a prima-facie case of race discrimination, the court concludes that Alexander has failed to show that Haddock's proffered reason for reducing Alexander's hours is mere pretext.   See Jackson v. State of Alabama State Tenure Com'n, 405 F.3d 1276, 1289 (11th Cir. 2005) ("In order to show pretext, the plaintiff must 'demonstrate that the proffered reason was not the true reason for the employment decision .... [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer

17

or indirectly by showing that the employer's proffered explanation is unworthy of credence.") (quoting Burdine, 450 U.S. 248, 256 (1981)).  Haddock asserts that after he purchased Penny Profit, he reduced not only Alexander's hours, but the hours of all employees who were not in management positions.  See Haddock Dep. at 23 (Doc. No. 37-8) ("Everyone [at Penny Profit] is part-time, including [Alexander], with the exception of two supervisors."). Penny Profit's business faltered after Haddock acquired ownership,[5] and Haddock testified that, once he "became more familiar with the business," he implemented "some management efficiency changes," id. at 24, by, for example, reducing Alexander's Opelika deliveries from two a day to one a day to save gasoline and charging front-counter workers with the tasks of sorting and tagging clothes while they were helping customers, though these responsibilities had originally been assigned to

_____

5. See Haddock Dep. at 39 ("Haddock: When I bought the cleaners when I took over, 1,200 piece count [of clothing] would be a pretty strong day .... Attorney: Now what would be a strong day? Haddock: 800.").

18

Alexander. Haddock also eliminated redundancies, scheduling one person to work the cash register, rather than the two employees who had traditionally done so. Responding to Alexander's assertions of bias, Haddock stated that, as Alexander was able to complete his duties in a 10-hour work week, it was unnecessary to schedule him for additional shifts.

Alexander has not demonstrated any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Haddock's] proffered legitimate reason[]," so that a "reasonable fact-finder could find [it] unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotations and citations omitted). Specifically, he has failed to show that Haddock reduced his hours for any reason other than purely as a money-saving measure. Alexander admits that neither Haddock nor any other employee ever "said anything of a racial nature" to him in the course of his employment at Penny Profit, Alexander dep. at 70, and he also testified that he has no additional evidence of

19

discriminatory "treatment," other than the record of his reduced hours and his belief that white employees were assuming his job responsibilities.     <u>Id</u>. at 71. Alexander's conclusory assertion that Haddock was motivated by animus is not, by itself, sufficient to satisfy the evidentiary requirements of summary judgment. <u>See</u> <u>Howard v. BP Oil Co, Inc.</u>, 32 F.3d 520, 527 (11th Cir. 1994) ("[The plaintiff's] bare assertion" of discrimination "does not create any fact question for the jury.").

Because Alexander is unable to show that Haddock reduced his hours as a pretext to engage in discrimination, summary judgment will be granted on his disparate-treatment claim.


### B. Disparate Impact

Alexander claims that Penny Profit and Haddock "engaged in practices which seem neutral on their face, but in effect have a disparate impact on the black employees at [Penny Profit]."     Pl.'s Br. at 21.

Specifically, he argues that Haddock's attempt to make the business more efficient "impacted only the black employees." Id. In order to survive summary judgment, Alexander must demonstrate that the "challenged employment action or practice has a disproportionate adverse impact on a category of persons protected by the statute." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1117 (11th Cir. 1993). This showing "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010) (quoting Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 987 (1988)). Once the plaintiff presents a prima facie case, the employer has the burden of showing "that 'any given requirement [has] a manifest relationship to the employment in question,' in order to avoid a finding of discrimination." Connecticut v. Teal, 457 U.S. 440, 446-47 (1982) (quoting Griggs v. Duke Power, Co., 401 U.S. 424, 432 (1971)) (alteration in original). Again, the plaintiff may still prevail, "if he shows that the

21

employer was using the [business] practice as a mere pretext for discrimination." Id. at 447 (citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975)).

The crux of Alexander's claim concerns the disparate impact of Haddock's "efficiency" policy on black and white employees; specifically, he asserts that, after Haddock bought Penny Profit, blacks suffered reductions in their work hours, while white schedules were unaffected. He also alleges that, under Haddock, the front counter cashiers "were mainly white," black employees were forced to work "in the back" of the dry cleaning plant, and a black employee cashier was "wrongfully accused of stealing and eventually quit her employment at [Penny Profit]." Pl.'s Br. at 22.[6]

---

6. Alexander also reiterates the factual allegations set forth under his disparate-treatment claim, that is, that white employees assumed his job responsibilities, which resulted in a drastic reduction in his hours. As these facts support only a claim for disparate treatment, rather than disparate impact, the court does not repeat its discussion of the merits of these allegations.

Alexander's evidence falls far short of demonstrating a "statistical disparity" in employment outcomes among black and white employees.  The time cards, relied on so heavily by Alexander in his brief, do not actually show that black employees' hours were reduced, while white employees' hours stayed the same.  What the cards do reveal is that the weekly work schedule was reduced generally for all employees, both black and white, over the course of the 2008 and 2009 fiscal years.[7]  Though most other employees were working significantly more hours than Alexander did (that is, upwards of 30 hours a week), this fact alone does not suggest discrimination, as Alexander was the only employee at the company in his particular position.  In sum, there is no statistical indication (let alone evidence) that Haddock's "efficiency policy" had a negative impact only on black employees.[8]

_____

7. Many of the time cards for the 2008 fiscal year are indecipherable, and so the court referred primarily to the 2009 cards in its review of the record.

8. In his deposition, Alexander names three black employees who were allegedly dissatisfied with their
(continued...)

23

Likewise, Alexander's anecdotal evidence does nothing
to advance his cause.  Alexander asserts that the front
counter cashiers "were mainly white," though his own
testimony fails to support this claim.  He stated that,
before Haddock took over the business, one or two black
employees worked the front counter and that, after Haddock
bought Penny Profit, one black worked the front counter
But he also testified that there is currently a white
employee who works the first shift at the counter, and a
black employee who works the second shift.  There is, in
fact, no indication that the number of black employees
working at the counter changed over the course of
Haddock's ownership.  As for Alexander's allegation that
black employees are required "to work in the back" of the
plant, the only substantive evidence Alexander presents is

---

8. (...continued)
hours, but he admits that he never "talked with" the
employees about the problem.  Alexander Dep. at 43-44
(Doc. No. 37-7).  Of the employment records that were
discernable for these named employees, there is no
evidence that their hours decreased over the relevant
time period.

24

his testimony that white supervisor Taylor was transferred from the back to the front counter, while black supervisor Dumas was prohibited from working in the front of the store.  However, Alexander admitted that he never spoke to Dumas about this issue, and it is clear from his testimony that he has no first-hand knowledge concerning other Penny Profit employees' job allocations.[9]  Finally, Alexander alleges that he overheard a black employee complain that she was being blamed for stealing money from the cash register, when a white employee was responsible for the theft.  Even if this hearsay evidence was admissible, it does not establish a pattern of unequal outcomes in the workplace.

Because Alexander is unable to establish a case of disparate impact, summary judgment on this claim will be granted.

----

9. See Alexander Dep. at 59 ("Attorney: Has Sheika [Dumas] complained to you about the fact that she's working in the back? Alexander: No. Attorney: Have you talked to her about any of these matters? Alexander: No.").

## C. Retaliation

Alexander claims that Haddock (and Penny Profit, through Haddock) retaliated against him, in violation of Title VII and § 1981, by issuing unwarranted reprimands and reducing his hours, after he submitted both an internal complaint and an official complaint to the EEOC for race discrimination.  In order to establish a prima-facie case of retaliation under both Title VII and § 1981, Alexander may show that (1) he engaged in protected activity; (2) he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse employment action.  Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008); Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  An action is "materially adverse" if it might dissuade "a reasonable worker from making or supporting a charge of discrimination."  Burlington, 548 U.S. at 68 (quotation marks and citations omitted).  See Gant v. Kash'n Karry Food Stores, Inc., 2010 WL 3035960 at *2 (11th Cir. 2010) (applying the Burlington Northern

26

"materially adverse" element to both Title VII and § 1981 claims of retaliation).

Alexander asserts that, after he informed Haddock that he believed his hours were being cut because of his race, he received an unfounded "write up" for failing to bag clothes correctly. Alexander Dep. at 61. Haddock continued to discipline Alexander after he complained, calling Alexander into his office on multiple occasions and reprimanding him for failing to do his job properly.[10] Alexander submitted a complaint for race discrimination with the EEOC in July 2008, after Haddock was unresponsive to his grievances. Alexander states that he received additional hours during the EEOC investigation, but these

_____

10. See Alexander Dep. at 65-66 ("Attorney: Other than that one write-up you talked about, do you claim that there are any other times that Rick [Haddock] has disciplined you or criticized your job performance because of your race? Alexander: He called me [into] the office on several occasions and just said that I was not doing -- I'm not doing certain things like just stuff that was not true, just like doing certain things, like I was not bagging the clothes right. Attorney: Was this before [or] after your complaint? Alexander: It was after.").

27

were again cut after the EEOC dismissed the charge and issued Alexander a "Right to Sue" notice.  He also alleges that soon after he submitted his complaint to the EEOC, his supervisor, Taylor, advised him to search for another job, informing him he was not going to receive additional hours at Penny Profit.  He alleges that each of these incidents were in retaliation for engaging in protected activity.

Alexander's testimony concerning the false write-up and discipline he received from Haddock after complaining about race discrimination creates a substantial question of material fact as to whether Alexander suffered retaliation, sufficient to overcome summary judgment.  "The antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms."  Burlington, 548 U.S. at 68 (citation omitted).  An employee faced with substantial and repeated censure and harassment upon filing an nternal complaint for race discrimination in the workplace-- undeniably protected behavior under Title VII--would be

28

less likely to file a lawsuit in order to ameliorate the problem, thus establishing material adverse action.  And as Alexander suffered such discipline immediately after submitting his complaint to Haddock, the record demonstrates a causal connection between the protected behavior and the adverse action.

In sum, as Haddock's alleged disciplinary tactics might well dissuade "a reasonable worker from making or supporting a charge of discrimination," Burlington, 548 U.S. at 68 (citations and quotation marks omitted), Alexander's claim of retaliation should proceed to trial.[11]


***


Accordingly, it is ORDERED as follows:

_____

11. Though Alexander also supports his retaliation claim with testimony concerning the reduction in his working hours and treatment by Taylor, his claim survives summary judgment on the basis of Haddock's disciplinary practices, and so the court does not reach these allegations.

(1) The motion for summary judgment submitted by defendants Evening Shade Inc. (d/b/a Penny Proffit Cleaners) and Rick Haddock (doc. no. 30) is granted as to plaintiff Louie Alexander's claims for disparate treatment and disparate impact.

(2) Judgment is entered in favor of defendants Evening Shade Inc. (d/b/a Penny Proffit Cleaners) and Haddock and against plaintiff Alexander, with plaintiff Alexander taking nothing as to his disparate-treatment and disparate-impact claims.

(3) Said motion for summary judgment is denied as to plaintiff Alexander's retaliation claim.  This claim will proceed to trial.

DONE, this the 10th day of August, 2010.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE